UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

FILED

AUG 1 4 2017

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
CAPE GIRARDEAU

JAMES S. MURPHY, )
 )
          Plaintiff, )
 )
vs. )   Cause No. 1:17CV131 JAR
 )
 )   **JURY TRIAL DEMANDED**
AJINOMOTO WINDSOR INC., Pam Cox, )
George Young, Karen Moore, Timothy )
Orman, Debra Whitaker, Shawn Dean, )
Christine Galbraith and Jenny Brooks )
 )
          Defendants. )

## COUNT I

### WHISTLEBLOWER VIOLATIONS UNDER SECTION 402 FOOD SAFETY MODERNZATION ACT 21 U.S.C. 399(d)

     Plaintiff James Murphy, pro se for his cause of action against Ajinomoto Windsor., Inc. a corporation, for violations of Section 402, Food Safety Modernization Act (FSMA) 21 U.S.C. 399(d), and states and alleges as follows:

     1.     This action for damages brought pursuant to the Whistleblower provisions of the (FSMA) 21 U.S.C. 339(d). The (FSMA) claim is a result of repeated harassment of Plaintiff, culminating in his dismissal from Ajinomoto Windsor, Inc. (Defendants) stemming, in whole or in part, from Plaintiff's protected activities under the (FSMA).

     2.     Plaintiff James Murphy is and was at all material times a resident of Wayne County, Missouri.

     3.     Defendant Ajinomoto Windsor, Inc. is and was at all material times a Oregon Corporation operating in and through the State of Missouri.

     4.     This Court has jurisdiction over this matter under the (FSMA), specifically 21 U.S.C. 399(d)(b)(4)(A). The Plaintiff resides in this District, and all the allegations took place in this District, and the Defendant operates a production facility in this District.

     5.     On June 16, 2015, Plaintiff filed a (FSMA) Complaint with the Secretary of Labor, Region 7, OSHA Whistleblower Office. That was within the 180 days from the date the plaintiff became aware of the defendant Ajinomoto Windsor, Inc.'s intent to take adverse or unfavorable personal action against him.

6. Pursuant to 21 U.S.C. 399(d)(b)(4)(A) of the (FSMA), the plaintiff has a statutory right to bring an original action in the United States District Court for a jury trial regarding Ajinomoto Windsor, Inc.'s violation Section 402, Food Safety Modernization Act (FSMA) 21 U.S.C. 399(d).

7. Pursuant to 21 U.S.C. 399(d)(b)(4)(A) of the (FSMA), the plaintiff now is bringing this action for de novo trial by the United States District Court of the Eastern District of Missouri, which Court has jurisdiction over this (FSMA) action without regard to the amount in controversy.

8. On June 16, 2015, Plaintiff filed a Complaint with the Federal Occupational Safety & Health Administration under the (FSMA) alleging that his reporting of allergen contaminations contributed to his suspension and termination. More than 210 days have passed since the Complaint was made and no final decision has been made. Under 21 U.S.C. 399(d)(b)(4)(A) of the (FSMA), Plaintiff is exercising his right to bring this action in this Court.

9. During the course of plaintiff's employment with the Defendant, Plaintiff engaged in numerous protected activities under the (FSMA). These include, but are not limited to, the following:

 a. Reporting violations of the Food Safety Modernization Act;

 b. Reporting his personal injury of March 19, 2015 and May 29, 2015 to Defendant's management;

 c. Confronting co-workers regarding violations of Policy and Procedures;

 d. Reporting unsafe management of chemicals;

 e. Reporting unsafe practices of storing garbage in warehouse where they thaw frozen vegetables;

 f. unlawful time clock procedures; and,

 g. Reporting retaliatory actions of Management.

10. In whole or in part as a result of Plaintiff's protected activities, he was wrongfully suspended without pay on June 1, 2015 and dismissed from his job by the Defendant on June 9, 2016, has lost wages and benefits, has endured mental anguish, and has suffered other damages.

WHEREFORE, in order to encourage employees to freely report all injuries without fear of any retaliation, thereby ensuring the Food and Drug Administration (FDA) has the necessary information to develop and administer an effective Food Safety Regulatory program that promotes safety in every area of our nation's food production operations, the plaintiff demands a Judgment under the (FSMA) for all relief necessary to make him whole, including but not limited to:

A. Expungement of all references to disciplinary action related to the Plaintiff James Murphy;

B. Awarding damages to Plaintiff against the Defendant in excess of $75,000.00 including, but not limited to, compensatory, presumed, and punitive damages;

C. Ordering that Defendant return Plaintiff to his former position with his seniority and benefits unimpaired;

D. Awarding interest, cost and disbursements in this action to the Plaintiff;

E. Awarding any reasonable attorney's fees that may be incurred to the Plaintiff; and

F. Providing such other and further relief as is fair, just and equitable.

## COUNT II
## ANTI-RETALIATION CLAIM UNDER 29 U. S. C. §215(a)(3) AND VIOLATIONS OF MISSOURI'S PUBLIC POLICY EXCEPTION DOCTRINE

11. This Court has jurisdiction over plaintiff's claims Anti-Retaliation Claims under 29 U.S.C. Section 215(a)(3) and violations of Missouri Public Policy Exception Doctrine because they are so intertwined with the federal retaliation claims under 28 U.S.C. Section 1367(a)

12. On or around August 2014 plaintiff started discussing the Defendants violations of Fair Labor Standards Act of 1938 regarding the failure to pay employees for donning and doffing.

13. On October 8, 2014 plaintiff sent Defendant George Young an email regarding Defendant Ajinomoto Windsor, Inc.'s time clock, sign in and out and 30 minute meal break procedures.

14. On October 9, 2014 plaintiff received a retaliatory disciplinary action for inquiring into policy being enforced by Defendant Ajinomoto Windsor, Inc. because plaintiff went over managements head to Defendant Young and that plaintiff has been warned regarding not following the chain of command. Even though the verbal disciplinary action was regarding breaking the chain of command the written disciplinary action was for plaintiff signing in at the time plaintiff clocks in a practice plaintiff had been doing for years. It was further claimed that plaintiff was working unauthorized over time with no evidence being presented to these facts

15. On October 27, 2014 Defendants Moore and Cox sought to terminate Complainant for invoking his Constitutional Rights to seek redress for violations of the Fair Labor Standards Act regarding donning and doffing.

16. On or around October 29, 2014 Defendant Moore had a discussion with Defendant Young regarding plaintiff's inquiring into Defendant Ajinomoto Windsor, Inc.'s donning and doffing practices, fourteen (14) days later on November 12, 2014 a fabricated disciplinary action was brought against plaintiff by co-worker William Sandman.

17. Mr. Sandman informed co-workers that he was going to get plaintiff fired.

18. Mr. Sandman then went to a co-worker Sam Clinton and tried to get him to go in and tell Defendant Moore that he overheard plaintiff make a vulgar comment about Mr. Sandman's wife.

Plaintiff walked into the break room and overheard Mr. Sandman arguing with Mr. Clinton about him refusing to back his statement and say he heard plaintiff make the comment.

19. Mr. Clinton informed plaintiff that Mr. Sandman was trying to get him to go in and tell Defendant Moore that he heard plaintiff make a comment about Mr. Sandman's wife, and that he wasn't going to go in and lie about it.

20. During lunch break Mr. Sandman informed plaintiff that they were tired of him threatening to file a suit against them and he was going to give them something to fire plaintiff for.

21. All of the above events flow from plaintiff reporting allergen contamination violations under the Section 402, Food Safety Modernization Act and donning and doffing violations under the Fair Labor Standards Act and were acts of retaliation.

22. In whole or in part as a result of Plaintiff's protected activities, he was wrongfully disciplined on November 12, 2014 and again on June 1, 2015 when plaintiff was suspended without pay from June 1, 2015 until his dismissal from his job by the Defendant on June 9, 2016, (over a year) plaintiff has lost wages and benefits, has endured mental anguish, and has suffered other damages.

WHEREFORE, Plaintiff prays judgment against the Defendants for actual and punitive damages in the sums as the Court has jurisdiction authority, and with respect to such damages as are fair and reasonable in the above matter, and for such other and further relief as to the Court may seem just and proper in the circumstances.

## COUNT III

### TITLE VII DISABILITY EMPLOYMENT DISCRIMINATION

23. Plaintiff, James S. Murphy proceeding pro se, brings this action pursuant to Title VII of the Americans with Disability Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117; and, the Missouri Human Rights Act (MHRA)

24. Plaintiff has obtained Notice of Right to Sue Letters from both Federal and State Commissions. (Attachment A)

25. Plaintiff was discriminated in that Defendants discriminately failed to:
   a) promote plaintiff,
   b) removed plaintiff from promoted positions,
   c) failed to properly accommodate plaintiff's disability,
   d) refused medical treatment and short term disability leave,
   e) sought to bring fabricated disciplinary actions for falsely reporting a work related injury,
   f) brought false and retaliatory disciplinary actions against plaintiff, and
   g) unequal terms and conditions of plaintiff's employment.

26. That these discriminatory acts to the best of plaintiff's recollection occurred mainly from March 19, 2015 until the present, that there were existing hostile attitudes towards plaintiff for reporting contaminations to corporate employees and later to the FDA on or around January 2014.

27. On October 24, 2012 Plant Manager Pam Cox sought to have Complainant removed from the Maintenance Purchasing Clerk position (which is supervised by her husband Gary Cox) due to Complainant reporting disability discrimination to Mr. Greg Geib, president and CEO of Complainant's Employer on October 23, 2012 regarding the treatment of his work related injuries and Respondents refusal to permit Complainant with accommodations for his restrictions that Complainant was placed on.

28. That plaintiff was permitted to continue filling the Maintenance Purchasing Clerk position.

29. That on or around March 19, 2015 plaintiff injured his self while lifting approximately 80 pounds above his should to an employee operating the mixer.

30. That plaintiff reported the injury and advised his supervisors that he felt it would be okay and every week advised his supervises the status of the injury.

31. On or around April 27, 2015 Plaintiff informed Karen Moore, Human Resources that he may need to see a doctor regarding his injury of March 19, 2015. After plaintiff informed Ms. Moore regarding his lower back still hurting him, plaintiff also informed his Production Supervisor Shawn Dean who stated your lucky your not working the line your back would really be hurting with your height.

32. On April 28, 2015 Mr. Orman and Karen Moore sought to retaliatory discipline plaintiff for purported time theft allegations for seeking medical attention for his work related injury.

33. On or around May 1, 2015 plaintiff requested to see a doctor because his injury was getting worse.

34. That plaintiff was seen by the physician and placed on medical leave until May 4, 2015.

35. When plaintiff returned and advised his supervisor that he would need to inform another worker to fill his position until May 4, 2015 because the doctor placed him on medical restriction his supervisor presented a hostile attitude towards plaintiff.

36. On May 4, 2015 plaintiff returned to work at 5:30 a.m. and filled his normal position of Team Leader.

37. On May 4, 2015 In the morning Production Supervisor Shawn Dean informed plaintiff that if he didn't have the Restrictions removed on the 15th when he seen the Doctor that he would be remove from the Team Lead position and assigned to working the Production Line. plaintiff informed Mr. Dean "that did not make since, why keep plaintiff as Team Leader for 10 days and then

say plaintiff can't do the job." His response was he didn't know. plaintiff then asked "why would they place him on the production line when they know it would hurt his back?" Mr. Dean stated plaintiff "needed to exercise his back!"

38. On May 5, 2015 plaintiff was removed from his Team Lead position and assigned to the production line on Line 3.

39. Plaintiff continued to complain that his back was killing him working on the production line to Pam Cox, Plant Manager and Karen Moore, Human Resources who stated that plaintiff would not be moved and would stay working on the Production Line.

40. On May 7, 2015 Plaintiff informed Karen Moore, HR that he needed to see the doctor again because his back was getting worse.

41. An appointment was set and plaintiff was seen by Dr. David Andrew Gayle again, who stated that he would tighten the restriction and that he couldn't do anything about plaintiff's neck and upper back because that wasn't part of the original injury of March 19, 2015.

Plaintiff informed the doctor that the only reason his upper back and neck starting hurting like it was, was because of the restrictions he placed on him caused his employer to change his job assignment.

The doctor stated that he would request Physical Therapy as well, and that plaintiff needed to inform his employer that they needed to follow the restrictions but that he couldn't make them put plaintiff at a certain job.

42. When plaintiff returned to work, plaintiff informed Karen Moore, HR that the doctor said that they needed to follow the restrictions and that by having plaintiff bending and stooping over the production line twisting back and forth was not complying with the restrictions.

Plaintiff was informed that he could sit as much as he wanted too, but that he was staying at that position.

43. Plaintiff informed Pam Cox, Plant Manger and Karen Moore, HR that Dr. Gayle stated they need to follow the restriction.

44. On or around May 18, 2015 plaintiff was interviewed by Defendant's Workers Compensation Insurance Investigator regarding his Work related injury of March 19, 2015 at which time it was learned that Defendants fraudulently informed their Workers Compensation Insurer that plaintiff was lying about injuring his back at work and that his injuries happen while plaintiff was home.

45. On May 21, 2015 plaintiff was seen by Dr. Gayle again and informed him that his Employer was refusing to approve Physical Therapy and he stated he would follow up with them.

Plaintiff confronted Karen Moore, HR concerning his Physical Therapy and informed her that Workers Comp. needed to either approve the claim or deny it because they were preventing him from getting treatment on his own.

46. On May 26, 2015 plaintiff confronted Ms. Moore again and informed her that they were purposely preventing him from getting treatment on his own because they knew he could not work with restrictions that they were claiming were not work related, per defendants policy.

Said action was to prevent plaintiff from going on short term disability. Defendant Moore called their workers compensation insurer and discussed plaintiff's Physical Therapy and was informed that it would be approved today. And further informed plaintiff, "that if they didn't approve it she would."

47. On May 29, 2015 at approximately 8:15 a.m. plaintiff started experiencing sever pain in his neck arms and hands so plaintiff filed another work injury report and submitted it to Karen Moore, HR because the report stated on the document: "that if you needed to see a doctor take it directly to Human Resources", at which time plaintiff requested to see a doctor.

48. That plaintiff was hurting pretty bad and did not hear from Defendant Moore, so plaintiff went to find out what was going on with him seeing a doctor.

Plaintiff could not find Defendant Moore and when he was returning to the Production Line plaintiff seen Production Manager, Defendant Orman and asked him if Defendant Moore had said anything to him about him seeing the doctor at which time Defendant Orman stated, "that she asked him if plaintiff had told him that he needed to see a doctor, because she didn't know if he needed to see one."

Plaintiff informed Defendant Orman that Defendant Moore knows plaintiff needed to see a doctor that he had informed her that he did! Defendant Orman said he would tell her.

49. About two hours later Defendant Orman gave plaintiff his appointment time for 2:45 p.m. plaintiff asked why Defendant Moore had the appointment set for after plaintiff's shift? And was informed by Defendant Orman that's what he was given.

50. That this appointment approximately six (6) hours later is out of the ordinary and plaintiff questioned it and was told he would have to continue working until then.

51. Plaintiff continued to work in pain all day, at approximately 2:25 p.m. at the end of plaintiff's shift. Plaintiff had went to put his stool up as he had done for the pass three (3) weeks. When he was confronted by Supervisor Defendant Shawn Dean who confronted him with an attitude about him leaving the production line, plaintiff questioned Defendant Dean regarding why he had a problem with him putting his stool in the Office today, because he had been doing this everyday for the last three (3) weeks? Defendant Dean refused to answer asking if he needed to take it to Human Resources

at which time plaintiff said go ahead he had done nothing wrong. Plaintiff then went back to the production line until the line shut down as he had done for the last several weeks.

52. Plaintiff was seen by Dr. Gayle at approximately 3:34 p.m. Dr. Gayle found plaintiff to be suffering from Lumbar Strain, a Thoracic Strain and a Cervical Strain. Because of the facts that plaintiff's employer was continuously forcing plaintiff to work in a position that was causing his injury to get worse or suffer disciplinary action.

Dr. Gayle informed plaintiff that his employer had just called a few minutes ago and approved his Physical Therapy (Physical Therapy was suppose to be approved May 26, 2015 per the discuss with Karen Moore above paragraph 46)

Dr. Gayle was perplexed at how to handle the situation that would get plaintiff's employer to place him back in his Team Lead position. Dr. Gayle asked plaintiff if he removed the standing restriction would his employer place him back in his Team Lead position. plaintiff said that he didn't know but we could try. Dr. Gayle then removed the standing restriction with No Repetitive Stooping, Squatting and Bending. Along with Lifting, Carrying, Pushing and Pulling Restrictions.

53. At approximately 4:50 p.m. on May 29, 2015 plaintiff returned from the doctor's office and informed Karen Moore that the Dr. Gayle wanted to know why Defendants moved plaintiff from a less strenuous job to a more strenuous job and Ms. Moore asked how it was more strenuous,

Plaintiff was informed that he would be able to return to his Team Lead position tomorrow May 30, 2015 plaintiff went and clocked out at that time. (It has been a standing policy for employees to stay clocked in when they are sent to doctor appointments by Defendants for work related injuries)

At no time was plaintiff questioned about any actions he had with Production Supervisor Defendant Shawn Dean regarding leaving the line to put his stool up or time clock issues.

54. On May 29, 2015 Karen Moore filled out a Disciplinary Action Report which sought disciplinary action against plaintiff for fraudulently claiming a work related injury on May 29, 2015. seeking advise from Defendant George Young.

55. On May 30, 2015 plaintiff came to work and performed his job duties as Team Leader on Line 2 with no incidents and no complaints. Due to issues in Pack-out plaintiff had to do his paper work a little late. But there were no complaints.

56. On June 1, 2015 plaintiff came to work and performed his Team Lead position as normal, because we ran a product that kept the line running through lunch breaks, plaintiff had to have employee Charles Martin do the Batter Operator position for 30 minutes while the Batter Operator went to lunch, because of plaintiff's lifting restrictions. This procedure has been used numerous times in the pass with no complaints.

57. On June 1, 2015 at approximately 12:47 p.m. plaintiff informed Ms. Moore, HR that he needed to take a FMLA day off tomorrow (June 2, 2015) to take his wife to the doctor. Plaintiff was not questioned about any insubordination, wage theft or policy violations.

58. On June 1, 2015 at approximately 2:00 p.m. plaintiff was informed by his Supervisor Defendant Dean that Defendant Moore, HR wanted him in the Office. Plaintiff went to the Office and was then informed by Defendants Moore, HR and Defendant Cox, Plant Manager that he was being suspended without pay pending investigation for possible policy violations during the week of May 25th, 2015, Defendants Moore and Cox refused to tell plaintiff what he had done.

59. On or around June 2, 2015 The investigation into the false injury report changed when Defendants learned that it was not a false injury claim, and that their actions could be considered retaliatory.

60. On June 4, 2015 plaintiff informed Defendant George Young that he had been leaving the line to put his stool up prior to the line shutting down and returning to the line, and that it was never complained about. And that plaintiff asked Defendant Dean why he had a problem with it today, because plaintiff felt that it was related to him reporting a injury earlier that morning.

61. On June 5, 2015 plaintiff was informed that he was being accused of leaving the line before shift end while the line was still running, on more then one occasion last week. And also that plaintiff engaged in confrontational, disrespectful, and insubordinate behavior when plaintiff refused to follow an instruction and/or argued about it.

62. Defendants Young, Cox and Moore have now changed the reasons as to why they sought plaintiff's suspension on May 29, 2015 by removing the false injury reporting claim and changing the allegations to insubordination for actions that were known to be false when video footage substantiated plaintiff's claims that the allegations against him were false.

63. Counsel Tracy C. Litzinger and Howard and Howard Law Firm entered into a conspiracy to hide the original reasons for the suspension of plaintiff for filing a work related injury report on May 29, 2015. By cloaking the document with attorney client privilege.

64. That Defendants destroyed, deleted or permitted the destruction of evidence of the false allegations against plaintiff, even after being informed that the video surveillance footage would show that the allegation against plaintiff were false.

65. Defendants Moore, Cox, Young and Counsel Tracy C. Litzinger permitted evidence to be deleted or erased that supported that plaintiff did not commit the allegations against him.

66. Defendants have a consistent pattern of retaliating or trying to bring disciplinary actions against plaintiff after he informs Defendants that he may need to see or needs to see a doctor for a work related injury.

67. On June 30, 2015 plaintiff was presented with allegations that plaintiff had lied about his restrictions on June 1, 2015 regarding lifting restriction where he had to have employee Charles Martin to do the batter position because plaintiff was not able to. Said allegation being false, plaintiff was on lifting restriction and did not lie about it.

## COUNT IV
## INJURIOUS FALSEHOODS

68. This Court has jurisdiction over plaintiff's claims for Injurious Falsehoods under Missouri law because the injurious falsehoods were perpetrated in retaliation of plaintiff reporting violations of federal and state laws and or so intertwined with the federal retaliation claims under 28 U.S.C. Section 1367(a)

69. On May 29, 2015 at approximately 8:00 a.m. Plaintiff reported an exacerbation of an injury as a result of Defendant's Pam Cox and Karen Moore's actions of assigning plaintiff to a job position in violation of medical restrictions.

70. Plaintiff has confronted defendants with violations of federal and state laws regarding FDA food safety contaminations and FLSA donning and doffing violations as well as violations of numerous policies and procedures, plaintiff has been called a snitch for reporting said violations as well as ridiculed for confronting said violations.

### Defendant Shawn Dean

71. Plaintiff has continually confronted Defendant Dean for violations of food safety and food sanitary procedures.

72. On May 29, 2015 at approximately 2:35 p.m. Defendant Shawn Dean made false allegations to Defendant Moore against plaintiff with the intention to cause harm to the plaintiff. Said allegations include, but are not limited to, the following:

    a. That Defendant Dean confronted plaintiff regarding his failure to use both hands at approximately 2:15 p.m.; and,

    b. That plaintiff left the production floor at 2:25 p.m. and left the production floor.

### Defendant Christine Galbraith

73. That Defendant Galbraith was aware that plaintiff was reporting management for violating Federal and State Laws.

74. On June 4, 2015 Defendant Galbraith made false allegations to Defendant Moore against plaintiff with the intention to cause harm to the plaintiff. Said allegations include, but are not limited to, the following:

    a. That she was working beside plaintiff on May 29, 2015;

      b.      That she seen and heard Defendant Dean come over to plaintiff and tell plaintiff to use two hands; and,

      c.      That plaintiff started to leave the production line and Defendant Dean came over and told plaintiff it was too early to leave.

### Defendant Karen Moore

75.    That Defendant Moore was aware that plaintiff was confronting employees regarding the violations of Food Safety Regulations and federal laws regarding donning and doffing as well as plaintiff's work related injuries and the medical restriction violations.

76.    On or around May 29, 2015 thru June 1, 2015 Defendant Karen Moore made false allegations against plaintiff with the intention to cause harm to the plaintiff. Said allegations include, but are not limited to, the following:

      a.      That she had reviewed video footage and observed Defendant Dean approach plaintiff and speak with him;

      b.      That she could see that plaintiff was mostly using one hand;

      c.      That she seen plaintiff stop working to talk to Christine Galbraith;

      d.      That she seen plaintiff pick up his stool and leave the line and she seen Defendant Dean speak to plaintiff and plaintiff continued to walk off;

      e.      That she observed plaintiff leave the production floor shortly after this;

      f.      That she observed plaintiff coming back from break late and leave the production line early on numerous occasions during the week of May 25, 2015 to May 29, 2015 when video footage supported that he did not;

      g.      That plaintiff did not inform management that co-worker William Sandman was leaving the production line and that he left in his car on first break and drove to town on November 12, 2014;

      h.      That plaintiff did not inform management of co-worker William Sandman retaliating against plaintiff confronting his actions of leaving the production line and leaving the premises on first break on November 12, 2014.

### Defendant Jenny Brook

77.    That plaintiff on numerous occasions confronted Defendant Jenny Brook's regarding the falsification of Food Production Reports.

78.    On or around July 8, 2015 Jenny Brook's made injurious falsehood allegations against plaintiff to Defendant Moore with the intention to cause harm to the plaintiff. Said allegations include, but are not limited to, the following:

      a.      That plaintiff informed Defendant Brook's that she should "write her foot injury up as work related and to have doctor to say it was from working.

### Defendant Timothy Orman

79. On or around June 1, 2015 Defendant Timothy Orman made knowingly false allegations against plaintiff in which he claimed that he over heard a discussion of Defendant Dean and plaintiff where Defendant Dean ordered plaintiff to go back to the production line, and that Defendant Orman watched plaintiff leave the production floor.

Said allegations knowingly being false and made in retaliation of plaintiff continually confronting the Defendants FLSA donning and doffing violations, FDA food safety violations and in retaliation for reporting work related injuries.

80. On March 16, 2016 Defendant Timothy Orman made false allegations to OSHA Investigator Shannon Huffman against plaintiff with the intention to cause harm to the plaintiff. Said allegations include, but are not limited to, the following:

    a. Defendant Orman informed OSHA Investigator Shannon Huffman that on May 29, 2015 he over heard Defendant Dean order Complainant to return to the production line and that Complainant refused and that plaintiff left the production floor at 2:25 p.m. and that he watched plaintiff leave; and,

    b. That plaintiff's claim of an allergen contamination on June 1, 2015 was false.

81. Said injurious falsehood allegations lead to plaintiff's suspension and termination.

### Defendant Debra Whitaker

82. That Defendant Moore was aware that plaintiff was reporting violations of food safety on numerous occasions, including reporting Frank King, Production Manager to the FDA for purposely contaminating food product with allergens.

83. Defendants fraudulently deceived the regulators who came in to investigate plaintiffs complaint to the United States Food and Drug Administration when they visited the company's facility to examine safety documents and records and SQF by providing the regulators with falsified documentation regarding food production.

84. On March 16, 2016 Defendant Debra Whitaker made false allegations to OSHA Investigator Shannon Huffman against plaintiff with the intention to cause harm to the plaintiff. Said allegations include, but are not limited to, the following:

    a. Defendant Whitaker informed OSHA Investigator Shannon Huffman that plaintiff never addressed allergen contaminations with her prior to the allergen contamination of June 1, 2015.

### Defendant George Young

85. That Defendant Young was aware that plaintiff had reported violations of food safety on numerous occasions, including reporting Frank King, Production Manager to the FDA for purposely contaminating food product with allergens. As well as, had full knowledge of plaintiff's work related injuries and was continually consulted regarding plaintiff's reporting of injuries, allergen contaminations and FLSA donning and doffing violations.

86. On March 23, 2016 Defendant Young made false allegations to OSHA Investigator Shannon Huffman against plaintiff with the intention to cause harm to the plaintiff. Said allegations include, but are not limited to, the following:

    a. That plaintiff was being disciplined for disciplinary actions unrelated to plaintiff's reporting of allergen contaminations.

When Defendant Young had knowledge the allegation against plaintiff were false and conspired with Defendants Ms. Cox and Ms. Moore to make sure video footage that showed the allegations made against plaintiff to be false were not preserved or destroyed, even after plaintiff requested said video's be reviewed and saved.

    b. That he had No knowledge of plaintiff's report of an Allergen Contamination until he received a copy of Complainant's Whistleblower Complaint; and,

    c. That he had no knowledge of plaintiff reporting allergen contaminations in the pass.

87. All of the above events flow from plaintiff reporting allergen contamination violations under Section 402, Food Safety Modernization Act and donning and doffing violations under the Fair Labor Standards Act as well as, retaliation for reporting work related injuries, all acts of retaliation in violation of plaintiff's civil rights under federal laws.

88. In whole or in part as a result of Plaintiff's protected activities, he was wrongfully disciplined and suspended without pay from June 1, 2015 until his dismissal from his job by the Defendant on June 9, 2016, (over a year on unpaid suspension pending investigation) plaintiff has lost wages and benefits, has endured mental anguish, and has suffered other damages.

WHEREFORE, Plaintiff prays judgment against the Defendants for actual and punitive damages in the sums as the Court has jurisdiction authority, and with respect to such damages as are fair and reasonable in the above matter, and for such other and further relief as to the Court may seem just and proper in the circumstances.

## COUNT V
## DEFENDANT'S VIOLATIONS OF MISSOURI REVISED STATUTES
## SECTION 290.140 AND SECTION 290.110

89. This Court has jurisdiction over plaintiff's claims against Defendants state law violation because they are so intertwined with the federal retaliation claims under 28 U.S.C. Section 1367(a)

90. Defendant Ajinomoto Windsor, Inc. (hereinafter "Ajinomoto") maintains a business office in Wayne County, Missouri, which employs more then 100 employees. Plaintiff is a resident of Wayne County, Missouri. The tortuous conduct hereinafter complained of occurred in Wayne County, Missouri.

91. Plaintiff was employed by Defendant Ajinomoto Windsor, Inc. during the periods of October 14, 2005 until June 9, 2016. Plaintiff at the time of his dismissal, had been employed by Defendant Ajinomoto for more than (90) days.

92. The Defendant George Young (hereinafter "Young") was, at all times herein mentioned the Vice President of Human Resources for Defendant Ajinomoto, Pam Cox (hereinafter "Cox") was, at all times herein mentioned the Plant Manager for Defendant Ajinomoto, at its place of business in Piedmont, Missouri and Karen Moore (hereinafter "Moore") was, at all times herein mentioned the Human Resource Manager for Defendant Ajinomoto at its place of business in Piedmont, Missouri.

93. Plaintiff was under the supervision of the Plant Manager Defendant Cox in his capacity as an employee of Defendant Ajinomoto at all times hereinafter mentioned.

94. On June 1, 2015 Defendants Cox and Moore placed Plaintiff on suspension pending the investigation into events that took place the week of May 25, 2015, Plaintiff was informed that if it was concluded that Plaintiff had not done anything wrong, Plaintiff would be paid for the time he was on suspension. (See Attachment B)

95. That for several months Plaintiff made numerous attempts to find out what was going on with his suspension and wanting to know when he could return to work, and was informed by Defendants Cox and Moore that they didn't know.

96. That on October 14, 2015 per policy Plaintiff received three (3) weeks paid vacation and in April, 2016 two (2) days paid personal leave.

97. That Defendants Ajinomoto, Young, Cox and Moore have refused to issue a check to Plaintiff in the amount of $1462.80 for the vacation pay and 195.04 for paid personal days that is due him for a total of $1657.84.

98. On March 5, 2016 Plaintiff sent by certified mail, in accordance with Section 290.140 R.S.Mo., and within one year after Plaintiff's said dismissal, a letter, signed by Plaintiff, to the registered agent for Defendant Ajinomoto, Defendant Cox requesting therein, that Defendant Cox furnish him with a service letter setting forth the nature and character of the service Plaintiff rendered to Defendant Ajinomoto, and the duration thereof, and truly stating for what cause, if any, you have decided to no longer employ Plaintiff.

Plaintiff further requested that since there has never been a determination that Plaintiff violated any policies Plaintiff requested that his employment be reinstated, and that Plaintiff receives compensation for all pay while Plaintiff was placed on suspension pending the investigation, and any wages due him in accordance to Sections 290.110 and 290.140. (See Attachment C)

99. That Defendant Cox did not respond to Plaintiff's request for a service letter.

100. On April 11, 2016 Plaintiff received a letter from Defendant Ajinomoto's Counsel Emily E. Bennett regarding his service letter sent on March 5, 2016 to Defendant Cox, which instructed Plaintiff that he was not to contact his Employer.

Said instructions are in violation of Section 290.140 which specifically directs Plaintiff to send by certified mail to the superintendent, manager or registered agent of said corporation, with specific reference to the statute. Said response to Plaintiff's Letter of Service is in violation of Section 290.140 and 290.110. (See Attachment D)

101. Defendants written reply to the lawful service letter request is deficient in the following respects:

   a) Defendant Cox's letter from her Counsel (Attachment D) did not state the nature and character of service rendered;

   b) Defendant Cox's letter from her Counsel (Attachment D) did not state the duration of Plaintiff's employment;

   c) Defendant Cox's letter from her Counsel (Attachment D) did not state the true cause of why Defendant Cox was refusing to further employ Plaintiff;

   d) Defendant Cox's letter from her Counsel (Attachment D) was not responded to by the superintendent or manager of said corporation to issue to such employee, within forty-five days after the receipt of such request; and

   e) Defendant Cox's letter from her Counsel (Attachment D) was not duly signed by such superintendent or manager, setting forth the nature and character of service rendered by Plaintiff to Defendant Ajinomoto and the duration thereof, and truly stating for what cause, if any, Plaintiff was discharged.

102.    Defendant Cox's failure to comply with Section 290.140 and 290.110 described in paragraph 11, fails to meet the statutory requirements imposed by Sections 290.140 and 290.110, and is equivalent to a non-issuance of a service letter.

103.    Defendant's Cox and Moore further violated Section 290.110 when on March 7, 2016 they refused to further employ plaintiff, and refused all unpaid wages to Plaintiff said amount being approximately $30.000 dollars per the agreement pending the suspension for investigation, that "if it becomes apparent that you did not violate any rules, policies, or procedures, you will be compensated for any time away from work due to the suspension" as well as all vacation and personal leave pay discussed in paragraph 96 and 97.

104.    Defendant Ajinomoto, Young, Cox, and Moore's conduct in failing to issue a service letter constitutes conduct that is outrageous due to Defendant's evil motive or reckless indifference to the rights of others, warranting judgment against Defendants for punitive damages.

WHEREFORE, Plaintiff prays judgment against the Defendants for actual and punitive damages in the sums as the Court has jurisdiction authority, and with respect to such damages as are fair and reasonable in the above matter, and for such other and further relief as to the Court may seem just and proper in the circumstances.

Respectfully submitted,

James Murphy, pro se
RR 1 Box 13360
Patterson, Mo.
63956